1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

11
12
13

SANTANA OCAMPO,

Petitioner,

14
15

v.

16

HAROLD CLARKE,

17

Respondent.

18
19
20

Case No.  C07-5671FDB/JKA

REPORT AND
RECOMMENDATION

**NOTED FOR:**
**May 23, 2008**

21
22
23
24
25
26
27
28

This habeas corpus action, filed pursuant to 28 U. S.C. 2254,  has been referred to the

undersigned Magistrate Judge pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636 (b)(1)(B) and

Local Magistrates' Rules MJR 3 and MJR 4.  Respondent has filed an answer to the petition (Dkt. #

13).  Petitioner has filed a traverse (Dkt. # 15 and 16).  This matter is ripe for review.

BASIS FOR CUSTODY AND FACTS

Petitioner is incarcerated for one count of murder in the first degree.  He was convicted in

Pierce County Superior Court and sentenced to 360 months of confinement. The sentence included a

1   60-month enhancement for a deadly weapon.

2         The Washington State Court of Appeals summarized the facts as follows:

3         Late on the evening of August 9, 2003, Julio Morales-Castro was shot in the
head while he sat in his car outside a pool hall. Morales-Castro died from those
4   injuries. At the scene, a witness reported seeing a blue minivan drive away after the
shooting. Other witnesses reported seeing three or more young Hispanic male gang
5   members running from the scene of the shooting. The area around the pool hall was a
common hangout for members of the Hispanic gang Surreno 13.

6
7         Detectives identified Jose Hernandez as one of the males running from the
scene. Detective David Devault interviewed Hernandez, who implicated Ocampo.
Based on Hernandez's statements, Detectives Robert Yerbury and John Ringer
8   interviewed Baldemar Vela.

9         Vela told the detectives he was reluctant to provide information because he
was afraid Surreno 13 would retaliate. Vela explained that on the night of the
10  shooting, he was out drinking and partying with Hernandez. Vela gave him a ride in his
van to Hernandez and two of Hernandez's friends. Hernandez sat in the front seat.
11  Vela stopped near the pool hall to purchase beer. Hernandez and his two friends got
out of the van and went in a different direction from Vela.

12
13        Vela was talking to someone when Hernandez reappeared. Two minutes
earlier, Vela heard what he thought was the sound of a firecracker. Hernandez was
14  nervous and sweating and his two friends were standing across the street. Hernandez
told Vela that they needed to leave because "someone was tripping on him." 3 Report
of Proceedings (RP) at 416. The four then took off in Vela's van, again with Vela and
15  Hernandez in the front seat. As he was driving, Vela overheard someone in the
backseat say, "I was tripping, so I had to shoot him." 3 RP at 422.

16
17        Vela identified Hernandez from a montage of black and white photos. What
happened next is disputed. According to Vela, he never looked at Hernandez's two
18  friends on the night of the shooting and could therefore not identify them. The
detectives gave him a single Polaroid color photograph and asked if the person was
19  one of the friends. When Vela stated that he did not know, the detectives responded
by telling Vela that the person had already admitted to being in the van. Vela then
said, "He probably was. If he is saying he was in my van, then he was." 3 RP at 459.

20
21        Detectives Yerbury and Ringer denied Vela's version of the interview. The
detectives explained that Vela was scared enough of gang retaliation that he talked
22  about moving away or joining the military. Vela "minimized his knowledge," talking
in vague generalities. 4 RP at 525. After Vela identified Hernandez, the detectives
wanted to see if he could identify Ocampo. But the detectives did not have a picture
23  of Ocampo. He had never been booked into jail and had not obtained a driver's
license or identification card. Because the detectives were concerned that if they
24  waited until Ocampo was arrested Vela would be uncooperative and backpedal from
what he had told them, they took a Polaroid photograph of Ocampo, who was being
25  interviewed in a different room. When they showed the picture to Vela, he readily
identified Ocampo as one of Hernandez's two friends, although he could not say if he
26  was the one who made the claim of shooting Morales-Castro.

27        The State charged Ocampo with first degree murder. Before trial, Ocampo
moved to suppress Vela's identification. The trial court denied the motion after
28

REPORT AND RECOMMENDATION
Page - 2

hearing Vela and Detective Ringer's testimony. The court found that Vela was not credible in denying that he had identified Ocampo or in asserting that he had not seen Hernandez's friends on the night of the shooting. The court concluded that although the single photograph of Ocampo was unduly suggestive, Vela's identification contained sufficient indicia of reliability to make it admissible. The court found significant Vela's certainty in the identification; Vela's prolonged opportunity to observe Ocampo on the night of the shooting; Vela's motivation to observe Ocampo after the shooting; and that Vela's identification was made only two weeks after the shooting.

At trial, the State called Hernandez, who agreed to testify truthfully at Ocampo's trial as part of a plea agreement to second degree murder. Hernandez testified that on the night of the shooting, Vela gave a ride to him, Ocampo, and Mesial Vasquez. When Vela stopped at the pool hall, Hernandez and Ocampo wandered off and came across a car with nice tire rims. The two decided to steal the car. Ocampo told Hernandez that he had a gun and would keep a lookout while Hernandez broke into the car. Hernandez began walking toward the car when Morales-Castrol exited the pool hall and headed toward the same car. Hernandez headed in a different direction. Once Morales-Castro was in the car, Ocampo approached him and asked for $2 to catch the bus, Morales-Castro stated that he had no money and then attempted to drive off, but as he did so, Ocampo pulled out his gun and shot Morales-Castro in the head.

The State also called Carla Bach, a juvenile detention officer at the Pierce County juvenile detention facility. Bach testified that during one shift, Hernandez approached her while several other detainees were around and he loudly asked if she knew why he was in custody. Bach indicated that she did not know and Hernandez responded, "I am in here for murder." 6 RP at 809. Hernandez then smiled and said that he was the shooter. Bach testified that she did not initially file a report on Hernandez's claim because, in her experience, juvenile detainees routinely exaggerated and misstated their crimes to gain status in the facility. Bach testified that the detainees would "battle" each other, going back and forth with who had the "better" crime. 6 RP at 810. Bach then explained why a report was eventually filed on Hernandez:

> Like I said, I have known Jose since he came in I think at 12; always really liked him. And my coworker, Dawn, we both have had a really good rapport with Jose, so I happened to see her on break and I told her of the incident because that was the main staff that works in foxtrot [detention pod] and she just kind of - - we both blew it off and said, there's no way, no way he could have been the shooter. That pretty much ended the conversation.

> Then I think, I don't know if it was the next day or within that week, Jose talked to her and admitted the same thing that he admitted to me, so we both thought at the time we need to make a report. 6 RP at 813. Bach clarified on cross-examination that they decided to file a report after Hernandez's second disclosure because they felt it was a "serious enough situation." 6 RP at 822.

Ocampo did not testify, but he presented several witnesses who each testified that Ocampo was at a party at the time of the shooting. Ocampo argued in closing that Hernandez killed Morales-Castro and that he was lying to save himself and possibly Vasquez.

1

2

        The jury found Ocampo guilty as charged.

(Dkt. # 14, Exhibit 5).

3                        PROCEDURAL HISTORY

4       Petitioner filed a direct appeal through counsel and raised the following claims:

5           Issue No. 1.  The State Improperly Invaded the Province Of the Jury By
        Having Witnesses Express Opinions That The State's Star Witness, Hernandez, Was
6       Credible And That Law Enforcement Believed Hernandez's Statement That Ocampo
        Shot And Killed Julio Morales-Castro Rather Than Hernandez's Admission That He,
        Hernandez, Killed Mr. Morales-Castro.
7
            Issue No. 2.  Repeatedly Eliciting Testimony As To The Credibility Of Key
8       Witnesses And Improperly Arguing Credibility Together With Personal Opinion Is
        Prosecutorial Misconduct Constituting Manifest Error Which May Be Raised First
9       Time On Appeal. Because This Case Turns On Witness Credibility The Error Is
        Manifest And Not Harmless And Ocampo's Conviction For Felony Murder In The
10      Second [sic] Degree Must Be Reversed.

11          Issue No. 3. The State Denied Ocampo His Right To Confront Witnesses
        When It Repeatedly Elicited From Law Enforcement Information Attributed To
12      Mesial Vasquez, Even Though Mesial Vasquez Did Not Testify.

13          Issue No. 4. The Court Erred When It Denied Ocampo's Motion To Suppress
        is [sic] Pre-Trial Identification By Baldemar Vela Because The Showing Of A Single
14      Polaroid Was Impermissibly Suggestive And Vela Testified He Was Not Sure
        Ocampo Was One Of The Three People He Drove Away From The Scene Of The
15      Shooting. [Error is Assigned to Disputed Finding of Fact starting at Line 24 though
        26 on page 4; Finding starting at line 3 through 11 of page 5; Finding starting at line
16      12 though 13 on page 5. Error is assigned to the Conclusions as to Disputed Facts
        found on page 5; to the Conclusion starting on line 7 though 10 on page 6; the
17      Conclusion starting on line 11 though 16 on page 6; the Conclusions starting on line
        23 though 25 on page 6; Conclusion starting on line 3 though line 10 on page 7]
18      (Note the Findings and Conclusions are attached as exhibit A and that they are not
        numbered).
19
            Issue No. 5. Baldamar Vela Was Put In The Untenable Position Of Having To
20      Claim The Police Acted Improperly During His Interview In Which The Police Claim
        He identified Ocampo As One Of The Passengers In His Van That Left The Scene Of
21      The Shooting.

22          Issue No. 6.  The Untainted Evidence Was Not Sufficient To Establish That
        Mr. Ocampo Shot And Killed Mr. Morales-Castro During The Course Or
23      Furtherance Of A Robbery.

24  (Dkt. #14, Exhibit 3).

25      On April 18, 2006, the Washington State Court of Appeals affirmed the conviction and

26  sentence (Dkt # 14, Exhibit 5).  Petitioner filed for discretionary review with the State Supreme

27  Court and raised the following claims:

28

1.      The State Improperly Invaded The Province Of The Jury By Having Witnesses Express Opinions That The State's Star Witness, Hernandez, Was Credible And That Law Enforcement Believed Hernandez's Statement That Ocampo Shot And Killed Julio Morales-Castro Rather Than Hernandez's Admission That He, Hernandez, Killed Mr. Morales-Castro.

2.      Repeatedly Eliciting Testimony As To The Credibility Of Key Witnesses And Improperly Arguing Credibility Together With Personal Opinion Is Prosecutorial Misconduct Constituting Manifest Error Which May Be Raised First Time On Appeal. Because This Case Turns On Witness Credibility The Error Is Manifest And Not Harmless And Ocampo's Conviction For Felony Murder In The Second [sic] Degree Must Be Reversed.

3.      The State Denied Ocampo His Right To Confront Witnesses When It Repeatedly Elicited From Law Enforcement Information Obtained During Police Interviews Attributed To Mesial Vasquez, Even Though Mesial Vasquez Did Not Testify.

4.      The Untainted Evidence Was Not Sufficient To Establish That Mr. Ocampo Shot And Killed Mr. Morales-Castro During The Course Or Furtherance Of A Robbery.

(Dkt. # 14, Exhibit 6).

In the federal Habeas Corpus petition that is now before this court petitioner raises the following claims:

1.      Denial of right to impartial jury; due process.

2.      Prosecutorial misconduct; right to fair trial.

3.      Denial of right to confrontation.

4.      Denial of due process; suggestive and unreliable identification procedure.

5.      Insufficiency of evidence.

(Dkt. # 3).

Respondent concedes that petitioner has exhausted issues one, two, three, and five. Respondent contends the fourth issue is unexhausted because it was not presented to the Washington State Supreme Court in the motion for discretionary review.

### EVIDENTIARY HEARING

If a habeas applicant has failed to develop the factual basis for a claim in state court, an evidentiary hearing may not be held unless (A) the claim relies on (1) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable, or there is (2) a factual predicate that could not have been previously discovered through the exercise

of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.  28 U.S.C. §2254(e)(2) (1996).  Petitioner's claims rely on established rules of constitutional law.  Further, petitioner has not set forth any factual basis for his claims that could not have been previously discovered by due diligence.  Finally, the facts underlying petitioner's claims are insufficient to establish that no rational fact finder would have found him guilty of the crime. Therefore, petitioner is not entitled to an evidentiary hearing.

STANDARD

Federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension.  Engle v. Isaac, 456 U.S. 107 (1983).  Section 2254 is explicit in that a federal court may entertain an application for writ of habeas corpus "only on the ground that [the petitioner] is in custody in violation of the constitution or law or treaties of the United States."  28 U.S.C. § 2254(a)(1995).  The Supreme Court has stated many times that federal habeas corpus relief does not lie for errors of state law.  Lewis v. Jeffers, 497 U.S. 764 (1990); Pulley v. Harris, 465 U.S. 37, 41 (1984); Estelle v. McGuire, 502 U.S. 62 (1991).

Further, a habeas corpus petition shall not be granted with respect to any claim adjudicated on the merits in the state courts unless the adjudication either  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. §2254(d).  A determination of a factual issue by a state court shall be presumed correct, and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. §2254(e)(1).

DISCUSSION

1.    Issues Relating to witnesses credibility, issues one and two.

Petitioner's first two issues relate to his argument that law enforcement officials and the prosecutor vouched for the credibility of the State's star witness, Mr. Hernandez.   The Washington State Court of Appeals addressed these two issues and held:

Ocampo maintains that the State offered several improper opinions on the

veracity of Hernandez and Vela's testimony and statements to detectives. It is improper for a witness to give an opinion on guilt or the veracity of the defendant or a witness. *State v. Dolan*, 118 Wn. App. 323, 329, 73 P.3d 1011 (2003) (improper opinion testimony violates "the defendant's constitutional right to a jury trial and invades the fact-finding province of the jury"); *State v Jerrels*, 83 Wn. App. 503, 507 925 P.2d 209 (1996). We take a narrow view of what constitutes improper opinion testimony. *State v. Demery*, 144 Wn. 2d 753, 760 30 P.3d 1278 (2001). "[T]estimnony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony." *City of Seattle v. Healey,* 70 Wn. App. 573, 578, 854 P.2d 658 (1993), *review denied*, 123 Wn.2d 1011 (1994). Whether testimony constitutes an impermissible opinion depends upon the circumstances of each case. *Healey,* 70 Wn. App at 579.

Ocampo first contends that Detective Devault gave an improper opinion on Hernandez's veracity. Detective Devault testified that, based on his interview of Hernandez, he obtained an arrest warrant for Ocampo. The prosecutor then asked the following question: "Did you feel that he was telling the truth to you?" 3 RP at 369. Detective Devault responded without objection, "Yes, I do." 3 RP at 369. Assuming this exchange was improper, Ocampo may not now raise the issue.

A party is estopped from assigning error to the admission of evidence that the party relied upon in its case. *Storey v Storey*, 21 Wn. App. 370, 376, 585 P.2d 183 (1978). *Review denied*, 91 Wn.2d 1017 (1979). Likewise, a defendant who makes a tactical choice hoping for some advantage "may not later urge his own action as a ground for reversing his conviction even though he may have acted to deprive himself of some constitutional right." *State v. Elmore*, 139 Wn.2d 250, 280 n.7, 985 P.2d 289 (1999). (quoting *State v Lewis*, 15 Wn. App. 172, 177, 548 P.2d 587, *review denied* 87 Wn.2d 1005 (1976)). *Cert. Denied*, 531 U.S. 837 (2000); *see also In re Pers. Restraint of Pirtle*, 136 Wn2d 467, 488, 965 P.2d 593 (1998)(defense counsel afforded wide latitude and flexibility in his choice of trial psychology and tactics).

Ocampo did not object to the detective's testimony that he believed Hernandez at the interview precisely because it supported his theory of the case. Ocampo's trial defense was that law enforcement and the prosecutor's office negligently and recklessly investigated Morales-Castro's murder. *See, e.g.*, 7 RP at 1007 (defense counsel's closing argument: "That is the definition of negligence. The police investigation started off negligent:). It was Ocampo's position that the State "closed this case when they got the statement from [Hernandez]. This case was closed. Done. Let's convict the 16-year-old kid, first-degree murder based on Jose Hernandez without even doing the investigation." 7 RP at 1028. Ocampo maintained that the State rushed to judgment and blindly accepted Hernandez's statements as gospel, thus overlooking the real killer, Hernandez. *See, e.g.*, 4 RP at 550 (defense counsel questioning Detective Ringer: "Was there ever any suspicion or any need in your mind to corroborate the story [Hernandez] is telling you? Do you guys just take it at face value, "that was good enough for us, case closed?"); 7 RP at 1003 (defense counsel's closing argument: "Hernandez shot and killed Julio Morales Castro . . . Jose lied about it to save himself. He lied about it to save or cover for two other people."). Ocampo is precluded from assigning error to Detective Devaults's testimony for the first time on appeal.

Ocampo also contends that Detective Ringer testified to "believ[ing] Hernandez's version of events over others." Br. Of Appellant at 13 (citing 4 RP at 539). But Again, Ocampo is estopped from raising this assignment of error. Morever, we note that Ocampo cites his cross-examination of the detective, where he testified

that witnesses at the crime scene identified members of the Surreno 13 gang that told them Hernandez was not involved.  Ocampo elicited this testimony.  Detective Ringer did not offer an opinion on the veracity of Hernandez's disclosures.

Ocampo next contends that Detective Ringer testified that "Vela was not being truthful when he testified he could not identify Ocampo as one of the persons in the back of his van." Br. Of Appelant at 16.  Ocampo is incorrect.  Detective Ringer did not offer an opinion on the truthfulness of either Vela's trial testimony or his statements to the detectives.  What Detective Ringer did testify to was his opinion that when Vela talked to the detectives, he talked in vague generalities and appeared to be minimizing his knowledge of the night of the shooting.  Detective Ringer also testified to his concern that Vela would change his story if the detectives did not have him immediately attempt to identify Ocampo.  Detective Ringer's testimony was based on his experience in interviewing people and Vela's own admitted fear of gang retaliation if he cooperated.  *See* ER 702, 704; *Heatley*, 70 Wn. App. At 578.  Detective Ringer's testimony was not improper.

Lastly, Ocampo contends that Bach gave improper opinion by testifying that she and her coworker did not initially believe Hernandez was the shooter.  But, Again, the record reflects that Ocampo did not object because Bach's testimony aided his trial defense.  Before Bach's testimony, Ocampo sought and obtained assurances that Bach would not offer a *current* opinion on whether Hernandez was the shooter.  Bach testified that a report was not initially filed for Hernandez's shooting claim because they thought he was "puffing" and they believed there was "no way, no way he could have been the shooter." 6 RP at 813.  Bach then explained that the situation became serious, and a report was necessary, when Hernandez again claimed to be the shooter.  Bach's testimony supported Ocampo's defense: Although Bach and her coworker really liked Hernandez, they were no longer confident in their disbelief of his claims.  We reject this assignment of error.

(Dkt. # 14, Exhibit 5, pages 7 to 10).

Petitioner also claims the prosecutor vouched for the credibility of the witness in closing argument and in eliciting testimony from Mr. Hernandez that he had agreed to plead guilty to a lesser charge in return for his truthful testimony.  There was no objection or request to redact the terms of the plea agreement.  The Washington State Court of Appeals held that under Washington law failure to object waived any error (Dkt # 14, Exhibit 5, page 10).  The court found the decision not to object was tactical and aimed at establishing the "State's devotion to a man Ocampo professed to be a liar and the real murderer."  The court noted the prosecutor did not offer any personal opinion as to Mr. Hernandez's credibility.

It is improper for the prosecution to vouch for the credibility of a government witness. United States v. Roberts, 618 F.2d 530,533 (9th Cir.1980), cert. denied, 452 U.S. 942 (1981); United States v. Potter, 616 F.2d 384, 392 (9th Cir.1979), cert. denied 449 U.S. 832 (1980); United States v. Davis, 564 F.2d 840, 866 (9th Cir.1977), cert. denied 434 U.S. 1015 (1978). However, a

prosecutor's assertions regarding the relative believability of the state and defense witnesses are not objectionable if they were inferences drawn from the evidence, not representations of his personal opinion. Duckett v. Godinez, 67 F.3d 734, 742 (1995).

Merely asking a defendant to speculate as to why his or her testimony conflicts with the testimony of another witness does not constitute prosecutorial misconduct. See United States v. Wellington, 754 F.2d 1457, 1468 (9th Cir.1985), cert. denied, 474 U.S. 1032 (1986).

> Vouching for the credibility of a government witness may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony. The first type of vouching involves personal assurances of a witness's veracity and is not at issue here.
>
> The second type of vouching involves prosecutorial remarks that bolster a witness's credibility by reference to matters outside the record. It may occur more subtly than personal vouching, and is also more susceptible to abuse. This court has declared that such prosecutorial remarks may be fatal if: ... the remarks, fairly construed, were based on the District Attorney's personal knowledge apart from the evidence in the case and that the jury might have so understood them.

Roberts, 618 F.2d at 533-34 (citations omitted). Here, the evidence was in the record and there was no objection to introduction of the evidence. Petitioner has failed to show the decision of the Washington State Court of Appeals resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or that the state court ruling resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. Petitioner's first and second claims are without merit.

2.    Right to confrontation.

Petitioner claims his right to confront witnesses was violated when a detective testified regarding contacts with Mr. Vasquez. Mr. Vasquez was allegedly the fourth person in the van the night of the shooting. He was allegedly not present when the shooting occurred.

A detective testified he spoke with Mr. Vasquez and Mr. Vasquez was reluctantly helpful. There was no testimony as to the substance of any statements made by Mr. Vasquez and defense had the ability to cross examine the detective. The Washington State Court of Appeals found Mr. Ocampo's right to confrontation was not violated by this testimony (Dkt. # 14, Exhibit 5, page 12).

REPORT AND RECOMMENDATION
Page - 9

As no out of court statements made by Mr. Vasquez were entered into the record through the detective, the court agrees that petitioner's right to confrontation was not violated by this testimony.

Petitioner also complains of Detective Ringer's testimony. The Washington State Court of Appeals considered the claim and stated:

> Ocampo next cites Detective Ringer's testimony concerning identification made by witnesses at the crime scene:
>
> Q    And when you showed these photographs, were you able to identify anybody in the photographs.?
>
> A    They did make identifications.
>
> Q    You seem reluctant to say that....Why are you reluctant?
>
> A    Well, in the long run some of the identification proved erroneous.
>
> Q    Why do you say that?
>
> A    As we investigated further, we found that one of the photographs, Jose Hernandez's identification of him, was accurate, but then some of the others were people that they knew but had not actually been involved in the shooting.
>
> Q    Okay. How were you able to determine that?
>
> A    Well, eventually Jose Hernandez was arrested, he gave a statement. Later we contacted Baldemar Vela, and he gave a statement that verified what Jose Hernandez said. And still later, Mesial Vasquez was interviewed and he also verified the other two.
>
> 4 RP at 515. The prosecutor used this testimony in closing argument: "Ladies and gentlemen, Jose's gone back and forth to some extent about the facts of this, but his statements, the core of his statements, were corroborated by Mesial Vasquez, Baldemar Vela and Marcos, as well as physical evidence." 7 RP at 993.
>
> As the prosecutor's closing reflects, the detective's testimony implies that Valquez gave a statement to law enforcement corroborating Hernandez's statement of those involved in the shooting. However, the record establishes that defense counsel was keenly aware of the Vasquez/*Crawford* issue and did not view the quoted testimony to be problematic or objectionable. Later in Detective Ringer's testimony, defense counsel made the following remarks in a sidebar:
>
> > [DEFENSE COUNSEL]: Your honor, with the questioning that's happening, I see where this is going. They are going to bring in next a statement by Mesial Vasquez [that] Santana Ocampo was in the van. Mesial Vasquez is not here, we are not able to confront this witness, don't know where he is. State's not going to produce him and I want to make sure there is no hearsay from Mesial Vasquez of my client being in that van coming into this testimony....
> >
> > [PROSECUTOR]: [Defense counsel] asked if there had been any

evident[sic]– actually, he made the statement there had been no efforts to corroborate and I think that there certainly were, and I think there certainly was, and I think there has –there was testimony both through direct and redirect and now in cross that indicates Mr. Vasquez's corroborating exactly what everybody else is corroborating.

THE COURT:        Well, I don't think it opens the door to introduce Vasquez's statement beyond the extent that there has already been testimony to efforts to corroborate. I think that's a dangerous road to go down and certainly don't want to have a <u>Crawford</u>- related problem.

[PROSECUTOR]: I have gone as far as I intend to go in that regard. I have just a couple more.

THE COURT:        All right.

[DEFENSE COUNSEL]:        I understand. I had to make sure that didn't happen.

4 RP at 556-57.

Ocampo is not entitled to a new trial based on this issue. First, he did not object to Detective Ringer's testimony. *See State v. Swan*, 114 Wn 2d 613, 661, 790 P.2d 610 (1990)("The absence of a motion for mistrial at the time of the argument strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial."), *cert. denied*. 498 U.S. 1046 (1991). Second, and as previously noted, Detective Ringer's testimony only implied the outlines of Vasquez's statement. *See State v. Lynn*, 67 Wn. App. 339, 345, 835 P2d 251 (1992) (RAP 2.5 (a), permitting a manifest constitutional error to be raised for the first time on appeal, requires an error that is "unmistakable, evident, or indisputable, as distinct from obscure, hidden, or concealed," and having "practical and identifiable consequences in the trial."). Third, Ocampo did not object to the prosecutor's closing. *See State v Brown*, 132 Wn.2d 529, 561, 940 P,2d 546 (1997)(defendant's failure to object waives improper closing remarks unless the comments are so flagrant and ill-intentioned that the resulting prejudice could not be alleviated by a curative instruction), *cert. denied*, 523 U.S. 1007 (1998). Fourth, defense counsel incorporated Vasquez's corroboration in the beginning of his closing argument where he suggested that Hernandez and Vasquez were trying to pin their actions on him.

(Dkt. # 14, Exhibit 5, pages 13 to15).

In <u>State v. Swan</u>, the Washington Sate Supreme court stated:

We have consistently held that unless prosecutorial conduct is flagrant and ill-intentioned, and the prejudice resulting therefrom so marked and enduring that corrective instructions or admonitions could not neutralize its effect, any objection to such conduct is waived by failure to make an adequate timely objection and request a curative instruction. Thus, in order for an appellate court to consider an alleged error in the State's closing argument, the defendant must ordinarily move for a mistrial or request a curative instruction. The absence of a motion mistrial at the time of the argument strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial. Moreover, "[c]ounsel may not remain silent, speculating upon a favorable verdict, and then, when it is adverse, use the claimed misconduct as a life preserver on a motion for new trial

1

2

or on appeal."

State v Swan, 114 Wn 2d 613, 661 (1990).

3

4

5

6

7

8

Petitioner in this case did not object to Detective Ringer's testimony and did not object to closing argument.  Petitioner fails to show that the Washington State Court of Appeals decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or that the state court ruling resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts.  Petitioner's third claim is without merit.

9

3.       Identification by photograph.

10

11

12

13

Petitioner argues it violated his constitutional rights when Mr. Vela was asked to identify him from a color Polaroid picture taken of Mr. Ocampo  While Mr. Ocampo presented this issue to the Washington State Court of Appeals, the issue was not included in his motion for discretionary review to the Washington State Supreme Court (Dkt # 14, Exhibit 6).

14

15

16

17

18

19

20

21

22

23

Respondent argues the claim is unexhausted and procedurally barred.  The court agrees.  In order to satisfy the exhaustion requirement, petitioner's claims must have been fairly presented to the state's highest court.  Picard v. Connor, 404 U.S. 270, 276 (1971); Middleton v. Cupp, 768 F.2d 1083, 1086 (9th Cir. 1985).  Petitioner did not present his claim regarding photo identification of him in his petition for discretionary review.  Thus, the issue was never before the Washington State Supreme Court.  A federal habeas petitioner must provide the state courts with a fair opportunity to correct alleged violations of prisoners' federal rights.  Duncan v. Henry, 513 U.S.364, 115 S.Ct. 887, 888 (1995).  It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state law claim was made.  Id, *citing* Picard v. Connor, 404 U.S. 270 (1971) and Anderson v. Harless, 459 U.S. 4 (1982).  This claim is unexhausted.

24

25

26

27

Normally, a federal court faced with an unexhausted or mixed petition dismisses the petition without prejudice, so that the petitioner has an opportunity to exhaust the claims in state court.  Now, however, petitioner is barred from filing another petition in state court as any attempt to file another petition will be deemed time barred. See, RCW 10.73.090.

28

Federal Courts generally honor state procedural bars unless it would result in a "fundamental

REPORT AND RECOMMENDATION
Page - 12

miscarriage of justice," or petitioner demonstrates cause and prejudice.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991).  Petitioner here cannot show cause and prejudice in state court.

To show cause in federal court, petitioner must show that some objective factor, external to the defense, prevented petitioner from complying with state procedural rules relating to the presentation of his claims. <u>McCleskey v. Zant</u>, 499 U.S. 467, 493-94 (1991). Here, petitioner simply failed to raise his issue in his motion for discretionary review.

In his traverse petitioner asks the court to consider this claim.  Petitioner argues his appellate counsel was instructed to raise the issue but did not do so.  The claim of ineffective assistance of appellant counsel is also unexhausted.  The court should not consider the photo identification claim on the merits.

4.  <u>Sufficiency of evidence</u>.

Petitioner alleges the evidence remaining in the case is insufficient to convict him.  Evidence is sufficient to support a criminal conviction if the record reasonably supports a finding of guilt beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 320 (1979).  The question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  <u>Id.</u>, citing <u>Johnson v. Louisiana</u>, 406 U.S. 356, 362 (1972).

In this case a witness, Mr. Hernandez, testified petitioner shot the victim in the course of a failed attempt to steal the victim's car.  The testimony that petitioner was present that night was corroborated by the driver of the van.  Further, The driver of the van testified Mr. Hernandez was in the front seat next to the driver when the driver heard someone in the back seat say "I was tripping, so I had to shoot him." 3 RP at 422.  The testimony shows the persons in the back seat were Mr. Ocampo and Mr. Vasquez.  Mr. Hernandez's testimony that Ocampo was the shooter along with Mr. Velas's testimony placing Mr. Ocampo in the back seat is sufficient evidence of guilt.

This petition should be **DISMISSED WITH PREJUDICE**.  Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  <u>Thomas v. Arn</u>, 474 U.S.

140 (1985).  Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on **May 23, 2008**, as noted in the caption.

DATED this 25 day of April, 2008.


/S/ *J. Kelley Arnold*
J. Kelley Arnold
United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 14